IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

GREGORY TAYLOR                                                    PLAINTIFF

VS.                              CASE NO. 06-CV-1079

GEORGIA-PACIFIC LLC
and INTERNATIONAL ASSOCIATION
FO MACHINIST AND AEROSPACE
WORKERS, LOCAL W475                                              DEFENDANTS

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed on behalf of Separate

Defendant Georgia-Pacific LLC ("Georgia-Pacific").  (Doc. No. 36).  The Plaintiff has filed a

response.  (Doc. No. 41).  Georgia Pacific has filed a reply to Plaintiff's response.  (Doc. No. 47).

The Court finds the matter ripe for consideration.

## FACTUAL BACKGROUND

On June 5, 2003, Gregory Taylor was hired by Georgia-Pacific as a Utility (general

laborer) in its Crossett Plywood and Studmill facility.  When he was hired, Taylor attended an

orientation and was given copies of Georgia-Pacific's rules and policies.  At this orientation,

Taylor was informed, among other things, that he would be subject to progressive discipline for

excessive tardiness and absenteeism.  He was also told that, in the event that he was unable to

report for work on a particular day, he was required to inform the company at least two hours

before the start of his shift.

The progressive discipline process used by Georgia-Pacific ordinarily consisted of four

steps:

> Step 1:  written reprimand
>
> Step 2:  written reprimand
>
> Step 3:  written reprimand with twelve (12) months probation and a three-day suspension
>
> Step 4:  discharge.

However, there was also an optional fifth step that could, in the discretion of the company, be implemented between the third and fourth steps of the process.  This optional fifth step consisted of  a suspension in lieu of discharge and an additional twelve (12) months probation.  The first and second steps of the discipline process were ordinarily effective for six (6) months.  If an employee did not receive another reprimand within that six month period, his prior reprimands would not be used against him.  The decision of whether an absence or tardy was an attendance violation and whether to discipline an employee for such a violation was within the discretion of an employee's front line supervisor.

At the time of his hire, Taylor was an experienced forklift driver.  On August 6, 2003, one month after being hired by Georgia-Pacific, Taylor was promoted from a Utility to a Forklift Operator. As a Forklift Operator, Taylor received a raise in his rate of pay.  In November 2003, Taylor began working as a Temporary Forklift Operator on the graveyard shift.  In this job, Taylor was transferred from one department to another on a temporary  basis.[1]

Starting in November 2003, Taylor began reporting to work late on occasion.  During the months of November and December 2003, Taylor reported to work late nine (9) times.  On

---

[1]  The Employment Change Record making this job change was dated October 6, 2003. However, the change was not effective until November 1, 2003.

November 29, 2003, he was counseled about these attendance violations.  However, he was not given a written reprimand by his supervisor.

At some point after being transferred to the temporary job, Taylor began driving a forklift for the skinner saw.  He claims that whenever anything went wrong with his job George Brandon, his supervisor, would cuss at him about his job performance.  As a result, Taylor asked to be transferred out of this job.  Georgia-Pacific granted this request and, on February 1, 2004, Taylor was returned to a utility position.[2]  As a result,  Taylor's pay was reduced to the utility rate.

After being returned to Utility, Taylor began working as a Veneer Strapper in the Finishing/Shipping Department.  In this job, Taylor would bundle veneer for shipment.  In doing so, Taylor would use a forklift to move bundles of veneer to a machine where he would strap them together.  After he strapped the bundles together, Taylor would use the forklift to move the bundles to the car line.  Therefore, part of the time, Taylor was driving a forklift and, part of the time, he was strapping veneer together.  Because he was driving a forklift, Taylor complained to John Tappin, his supervisor, about being paid at the Utility rate.  Thereafter, Georgia-Pacific began paying Taylor at the full Forklift Ooperator rate even though a Veneer Strapper is classified as a Utility.

In 2004, Taylor continued to have attendance problems at work.  On April 27, 2004, John Tappin talked to him about his tardiness.  Tappin told Taylor that his violations of the company's attendance policy would no longer be tolerated.  Despite this counseling, Taylor reported to work

---

[2] The Employment Change Record states the reason for the transfer as "disqualify as a forklift operator for the skinner saw.  Cannot handle driving for saw."  Taylor disputes this explanation.

late eighteen (18) times and was absent from work eight (8) times in 2004.  However, Taylor was still not formally disciplined for any of his attendance violations.

In early 2005, Taylor approached Greg Pearce, the Plant Superintendent, and asked about being promoted to a supervisory position.[3]  Pearce informed Taylor that he would not qualify for such a promotion because of his poor attendance record.[4]  However, Taylor was permitted to interview for a promotion to the position of Quality Control Supervisor.  Donald Evans, a Caucasian male who worked in the Finishing/Shipping Department with Taylor, was also interviewed for the job.  At the time of these interviews, Taylor's attendance record showed that besides his past absence and tardies in 2003 and 2004,[5] he had been tardy two (2) times and absent two (2) days in January and February 2005.  Evans' attendance record showed that he had been absent one (1) time and tardy zero (0) times since his hire in October 2004.  Taylor was not promoted to the position of Quality Control Supervisor.  Evans was. Georgia-Pacific's stated reason for not giving Taylor the promotion was his history of attendance problems.

Around this same time, several other Caucasian males were also promoted to supervisory positions.  In April 2005, Danny Winchester was promoted to a supervisor job within the Finishing/Shipping Department.  Winchester had zero (0) absences and zero (0) tardies since his hire in November 2004.  In June 2005, John Carter was promoted to supervisor  within the Dryer

---

[3] In his response, Taylor indicates that he approached several managers about a promotion to a supervisor job in 2004.  However, his 2005 inquiry is the only one raised in his Amended Complaint.

[4] Georgia-Pacific states that attendance is one of the primary factors it considers when making a decision regarding a promotion to a supervisory position.

[5] Taylor's attendance record showed nine (9) tardies in 2003; eighteen (18) tardies and eight (8) absences in 2004.

Department.  Carter had ten (10) absences and zero (0) tardies in 2004.  In October 2005, David Mercer was promoted from the Finishing/Shipping Department to a supervisory position in the Green End Department.  Mercer had two (2) absences and zero (0) tardies since his hire in September 2005.  In the beginning of 2006, Rodney Vincent was promoted to a supervisor job within the Finishing/Shipping Department.  He had zero (0) absences and (0) tardies since his hire in October 2005.   Taylor claims that he was better qualified for a supervisory position than any of these individuals.

On May 7 and 8, 2005, Taylor was absent from work.  Upon his return on May 11, John Tappin gave Taylor a first-step reprimand for violation of the company's rule against tardiness and absenteeism.[6]  During the next three months, Taylor was late to work seven (7) times and absent one (1) day.  His supervisor counseled him about these violations on two separate occasions.  On August 12, 2005, after reporting to work late the previous day, Tappin gave Taylor a second-step reprimand.[7]

On that same day, Taylor asked to be considered for a promotion to supervisor.  He was not promoted.  Georgia-Pacific's stated reason for not promoting Taylor was his poor attendance history.[8]  During this same time, Donald Evans was again promoted.  This time he was promoted

---

[6] Under Georgia-Pacific's progressive discipline process, this reprimand was ordinarily effective for six (6) months.  Therefore, if Taylor did not receive another reprimand within the next six months, the reprimand would not be used against him.

[7] Again, this reprimand was ordinarily effective for six (6) months.  If Taylor did not receive another reprimand within this six month period, his prior reprimands would not be used against him.

[8] By this time, Taylor had received a second-step reprimand in connection with his poor attendance.

to the position of Storeroom Supervisor.

After receiving his second-step reprimand, Taylor asked the Union to file a grievance on his behalf  regarding the discipline.  After discussions with the Union, Georgia-Pacific agreed to reduce the effective time of Taylor's second-step reprimand from the usual six (6) months to three (3) months.[9]  As a result, if Taylor did not receive another reprimand within the next three (3) months, his prior reprimands would not be used against him.

On August 25, 2005, Taylor did not show up for work.  When he came to work the next day, Taylor informed his supervisor, Danny Winchester, that the reason for his absense was his airline flight from Denver was delayed due to Hurricane Katrina.  Later, Taylor provided the company with airline records showing that his flight from Denver had been delayed 15 minutes.  Georgia-Pacific rejected Taylor's excuse for being absent.  He was given a third-step reprimand, put on twelve-month probation and suspended for three days.[10]  Taylor claims that Scott Atchison, Georgia-Pacific's Human Resource Manager, reversed this discipline after he provided him with the airline records.  However, Atchison states that he has no recollection of issuing any letter reversing this discipline against Taylor. On November 12, 2005, Taylor was again absent from work.  He did not receive any further discipline for this attendance violation.

On November 29, 2005, Taylor filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  In this charge, Taylor claimed that Georgia-

---

[9] This agreed reduction was put into a letter from Human Resources Manager Scott Atchison dated August 23, 2005.

[10] Taylor was suspended for three days–August 26, 27 and 28, 2005.  He was then off his normal days off–Monday, August 29 and Tuesday, August 30.  Thus, Taylor returned to work on Wednesday, August 31, 2005.

Pacific discriminated against him on the basis of his race and gender when it failed to promote him to a supervisory position in 2005.  He claimed that this conduct was in violation of Title VII.

In December 2005, Michael Blackburn became Taylor's superintendent in the Finishing/Shipping Department.  Blackburn noticed that Gregory Perkins, Bradley Craig and Taylor, all classified as Utilities, were being paid at the full Forklift Operator rate even though they were driving a forklift for part of the day.  Thereafter, Blackburn began to pay Taylor, Perkins and Craig at a split rate of pay–one-half at the utility rate and one-half at the forklift rate. Perkins and Craig were both Caucasian.  Taylor complained about the pay rate change to Blackburn.  Blackburn told Taylor the basis for his decision to split their pay and that it was made in accordance with the Labor Agreement.[11]

During the week of February 19, 2006, Taylor was absent one day and tardy one day.  On March 5, 2006, he was again absent from work.  Taylor's supervisor counseled him about the absence and reminded him that he was on twelve-months probation.  Six days later, on March 11, 2005, Taylor was absent again.  Taylor called in after his shift had already started to say that he was not coming to work.  He was told to come in at 8:00 the next morning and talk to a superintendent.  At that time, Taylor was given the optional fifth step in the progressive discipline process–a suspension in lieu of discharge.  Taylor was suspended until March 24, 2006 and his probation was extended for a period of twelve months.

On April 8, 2006, Taylor was late to work.  Danny Winchester, Taylor's supervisor,

---

[11] Section 6:03 of the Labor Agreement between Georgia-Pacific and the Union states: "Employees who for two (2) hours or more perform duties that pay a higher rate of pay shall receive the rate of pay for the time employed on the job at a higher rate."

counseled him about his tardiness.  Taylor was told that this was the last time that an attendance violation would be tolerated.  Then, on May 17, 2006, Taylor called in after his shift had started and stated that he was not coming to work because he had diarrhea.  When he came into work the next night, he provided a doctor's note stating that he had been absent from work because of "illness."  Taylor was told to go home and report to work the next day to meet with Human Resources.  When Taylor returned the next day, he met with Scott Atchison, the Human Resources Manager, and Johnny Robinson, a Union steward.  At this meeting, Taylor complained that he had no union representation the night before when he was told to go home.  Thereafter, on May 22, 2006, a termination hearing was held with Taylor and a Union representative.  After the hearing, Taylor was notified by Scott Atchison that he had been terminated effective May 22, 2006, for violating the company's attendance policy.

Thereafter, Taylor requested that the Union file a grievance in connection with his discharge.  After conducting an investigation, the Union determined that there was no merit to filing a grievance regarding Taylor's discharge.  On August 10, 2006, Taylor was notified of the Union's determination.

On August 2, 2006, Taylor filed suit against Georgia-Pacific.  In his Complaint, Taylor alleged that Georgia-Pacific violated Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") by discriminating against him on the basis of  race and gender in the areas of failure to promote and wrongful termination.   Taylor alleged that Georgia-Pacific retaliated against him in violation of Title VII when it split his pay in December 2005 and terminated him in May 2006.  He also alleged that Georgia-Pacific violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"), by interfering with his ability to

8

exercise his rights under the Act and retaliating against him for taking FMLA leave.

On September 19, 2006, Taylor filed a second charge of discrimination with the EEOC. In this charge, Taylor claimed that he was discriminated against on the basis of race, gender and retaliation when Georgia-Pacific terminated his employment on May 22, 2006.

On January 18, 2007, Taylor filed an Amended Complaint in this action.  In his Amended Complaint, Taylor asserts  claims against his former Union, the International Association of Machinist and Aerospace Works, Local W475, and added a claim against Georgia-Pacific for breach of the Labor Agreement between Georgia-Pacific and the Union.  The matter is now before the Court on Georgia-Pacific's Motion for Summary Judgment.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established.  The Federal Rules of Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995).  The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial–whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986).  *See also Agristor Leasing v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-*

9

*Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986).  A fact is material only when its resolution affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996).  The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.*  The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of LeSueur,* 47 F.3d at 957.  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

## DISCUSSION

### I. CLAIMS PURSUANT TO TITLE VII

Taylor alleges that Georgia-Pacific discriminated against him on the basis of his race and gender in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e *et seq.*  Taylor also alleges retaliation under Title VII.  In employment discrimination cases under Title VII, the Supreme Court has long applied the familiar three-step burden shifting framework set out in *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under *McDonnell Douglas,* the plaintiff must first establish a prima facie case of discrimination.  If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a

legitimate non-discriminatory reason for the alleged discrimination.  If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination.  Taylor claims that he was discriminated against on the basis of his race and gender in the areas of failure to promote, wrongful termination and disparate treatment.  He also claims that Georgia-Pacific retaliated against him.  The Court will address each of these claims separately.

### Taylor's Failure to Promote Claim

Taylor claims that Georgia-Pacific failed to promote him to a supervisory  position because of his race and gender in violation of Title VII.  In order to establish a *prima facie* case of failure to promote, Taylor must show 1) that he is a member of a protected class; 2) that he was qualified and applied for a promotion for which Georgia-Pacific was seeking applications; 3) that he was rejected despite his qualifications; and 4) that other similarly situated employees who were not members of the protected class were promoted.  *Lyoch v. Anheuser-Busch Companies, Inc.,* 139 F.3d 612, 614 (8th Cir. 1998).

First, Georgia-Pacific claims that Taylor can not satisfy the second element of his *prima facie* case–that he was qualified for promotion to a supervisory position. Therefore, it argues that Taylor's claims of failure to promote based on race and gender should fail as a matter of law.

In response, Taylor contends that he satisfies the second element of his *prima facie* case because he was qualified to operate a forklift on a part-time basis and Georgia Pacific admitted that Taylor was denied a promotion because of his poor attendance history, not poor job performance.  How well Taylor could operate a forklift has no bearing on whether he was qualified for a promotion to a supervisory position.  Attendance does.  In fact, the evidence

11

shows that Georgia-Pacific considers attendance a primary factor in deciding whether to promote an employee to a supervisory position.

In this case, Taylor had a very poor attendance history.  When he asked to be promoted to a supervisory position in 2005, he had some twenty-nine (29) tardies and ten (10) absences on his record.  With this record, it can not be said that Taylor was qualified for a supervisory position where showing up for work regularly and on time is an important aspect of the job.  *See Fuller v. Alliant Energy Corp. Servs.,* 456 F.Supp. 2d 1044, 1065 (N.D. Iowa 2006).  Therefore, Taylor has failed to satisfy the second element of his *prima facie* case.

Georgia-Pacific also claims that Taylor can not satisfy the fourth element of his *prima facie* case–that similarly situated employees not in the protected class were promoted.  Therefore, it argues that Taylor's claim for failure to promote based on race and gender must fail as a matter of law.

In his response, Taylor does not point to any similarly situated female employees who were promoted instead of him.  As a result, he can not establish the fourth element of his *prima facie* case of failure to promote based on gender.  Thus, this claim must fail.

However, Taylor does point to five Caucasian employees, Donald Evans, Danny Winchester, David Mercer, John Carter and Rodney Vincent, who were promoted during 2005 and early 2006.  He claims that these individuals were similarly situated employees outside the protected class who were promoted instead of him.  In order for an employee to be similarly situated to Taylor, the employee must have dealt with the same supervisor, have been subjected to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.  *Tolen v. Ashcroft,* 377 F.3d 879, 882-83 (8th Cir. 2004)(citations omitted).

12

In this case, only four of the five individuals who Taylor points to as similarly situated employees worked in the same department and dealt with the same supervisor as he did. John Carter worked in the Dryer Department. He did not work in the same department as Taylor or have the same supervisors. Therefore, Carter is not similarly situated to Taylor. The remaining four individuals, Donald Evans, Danny Winchester, David Mercer and Rodney Vincent, worked in the same department as Taylor, but none of them had the same poor attendance record that he did. At the time Evans was promoted in March 2005, he had zero (0) tardies and one (1) absence on his record. David Winchester had zero (0) tardies and zero (0) absences on his record when he was promoted in April 2005. David Mercer had zero (0) tardies and two (2) absences on his record when he was promoted in October 2005. And, Rodney Vincent had zero (0) tardies and zero (0) absences on his record when he was promoted in early 2006. This is compared to the some twenty-nine (29) tardies and ten (10) absences that Taylor had on his record in early 2005 when he asked to be promoted to a supervisory position. It is clear that these individuals did not engage in the same conduct, without any mitigating or distinguishing circumstances, that Taylor did. Therefore, they are not similarly situated to Taylor and can not be used to establish the fourth element of his *prima facie* case of failure to promoted based on race.

Taylor has failed to establish the second and fourth elements of his *prima facie* case of failure to promote based on race and gender. However, even if Taylor could establish his *prima facie* case for these claims, the result would be the same. Georgia-Pacific has produced a legitimate non-discriminatory reason for the alleged discrimination. Taylor was not qualified for a supervisory position because of his poor attendance record. Taylor has not shown that this reason is merely a pretext for racial or gender discrimination. Accordingly, Taylor's failure to

13

promote claims under Title VII must fail as a matter of law.

*Taylor's Wrongful Termination Claims*

Taylor alleges that he was terminated from his job in violation of Title VII.  In order to establish a prima facie case of wrongful termination under Title VII, Taylor must show that 1) he is a member of a protected class; 2) he was meeting Georgia-Pacific's legitimate job expectations; 3) he was discharged; and 4) his discharge occurred under circumstance giving rise to an inference of discrimination.  *Pope v. ESA Servs. Inc.,* 406 F.3d 1001, 1008 (8th Cir. 2005). Such an inference of discrimination may exist where an employee shows that he was treated less favorably than other similarly situated employees who are not in the protected class.  *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir. 2000).

Georgia-Pacific claims that Taylor can not establish the second element of his *prima facie* case–that he was meeting Georgia-Pacific's legitimate job expectations.  Therefore, his claim of wrongful termination based on race and gender should fail as a matter of law.

In response, Taylor argues that he satisfies the second element of his *prima facie* case because he was not discharged due to his performance.  It is true that Taylor was not discharged for poor performance.  However, performance is not the only legitimate job expectation that an employer has of its employees.  There is no doubt that an employee showing up for work regularly and on time is a legitimate job expectation of an employer.  In this case, Taylor had a very poor attendance record.  He amassed numerous tardies and absences during his time at Georgia-Pacific.  He was counseled about his attendance violations on multiple occasions.  He went through all four-steps of the progressive discipline process, as well as the optional fifth step–suspension in lieu of discharge.  With this record, it can not be said that Taylor was meeting

14

Georgia-Pacific's legitimate job expectations. Therefore, Taylor has failed to satisfy the second element of his *prima facie* case.

Georgia-Pacific also claims that Taylor can not satisfy the fourth element of his *prima facie* case–that he was discharged under circumstances giving rise to an inference of discrimination.  Therefore, it argues that Taylor's claim for wrongful termination based on race and gender must fail as a matter of law.

In his response, Taylor points to two Caucasian employees, Shawn Herbert and Houston Pamplin, and one female employee, Tracy Bryant, who were similarly situated and were not discharged.  As stated previously, in order for an employee to be similarly situated to Taylor, the employee must have dealt with the same supervisor, have been subjected to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.  *Tolen,* 377 F.3d at 882-83.

First, Taylor points to a female employee, Tracy Bryant, who he claims was a similarly situated employee outside the protected class who was treated more favorably than him. However, Bryant worked in the Dryer Department.  She did not work in the same department as Taylor or have the same supervisors.  Bryant was not similarly situated to Taylor.  Therefore, he can not establish the fourth element of his *prima facie* case of wrongful termination based on gender.

Taylor next points to Houston Pamplin, a Caucasian employee, as a similarly situated employee outside the protected class who was treated more favorably than him.  It is true that Pamplin  worked in the same department as Taylor.  However, in the year preceding Taylor's termination, Pamplin only had three (3) attendance violations and one (1) attendance related

15

discipline, while Taylor had eighteen (18) attendance violations, had been through all four steps of the progressive discipline process, had a three-day suspension and was on twelve-months probation.  It is clear that Pamplin and Taylor did not engage in the same conduct without any mitigating or distinguishing circumstances.  Therefore, they were not similarly situated.

Taylor also points to Shawn Herbert, a Caucasian, as a similarly situated employee outside the protected class who was treated more favorably than him.  Here, Herbert and Taylor both worked in the same department, both had numerous attendance violations, and both went through the four-step progressive discipline process.[12]   Taylor claims that he was treated less favorably than Herbert because Herbert abandoned his job before he could be discharged and Taylor did not.  However, the result is the same.  Neither man was allowed to continue working for Georgia-Pacific because of attendance violations.  If Herbert had gone to his termination hearing, he would have been fired just like Taylor.  The fact that Herbert abandoned his job before that could happen does not make Georgia-Pacific's treatment of him more favorable. Therefore, Shawn Herbert can not be used to establish the fourth element of Taylor's *prima facie* case of wrongful termination based on race.

Taylor has failed to establish the second and fourth elements of his *prima facie* case of wrongful termination based on race and gender.  However, even if Taylor could establish his *prima facie* case for these claims, the result would be the same.  Georgia-Pacific has produced a legitimate non-discriminatory reason for discharging Taylor. He had numerous violations of the company's attendance policy.  Taylor has not shown that Georgia-Pacific's stated reason for his

---

[12] Taylor was allowed to take advantage of the optional fifth step–suspension in lieu of discharge, before he was scheduled for termination.  Herbert was not.

16

termination was merely a pretext for racial or gender discrimination.  Accordingly, Taylor's

claims for wrongful termination under Title VII must fail as a matter of law.

### Taylor's Disparate Treatment Claim

In his response to Georgia-Pacific's summary judgment motion, Taylor claims that

Georgia-Pacific discriminated against him based on race and gender when it denied him non-

FMLA leave on May 17, 2006.  This is the first time that Taylor has raised this discriminatory

denial of leave claim.  Therefore, it is not properly before the Court and must be dismissed.  *See*

*Cofer v. Schriro,* 17 F. Appx. 504 (8th Cir. 2001)(a claim raised for the first time in opposing

summary judgment is not properly before the court).  However, even if Taylor had previously

raised this claim, it would fail.  As previously held by the Court, Taylor was not meeting

Georgia-Pacific's legitimate job expectations.  Therefore, he could not establish the second

element of his *prima facie* case of  disparate treatment discrimination[13] and this claim would fail

as a matter of law.

### Taylor's Retaliation Claims

Taylor alleges that Georgia-Pacific retaliated against him in violation of Title VII.  A

claim of retaliation pursuant to Title VII is not based upon race or gender discrimination, but

instead upon "an employer's action taken to punish an employee who makes a claim of

discrimination."  *Haas v. Kelly Services, Inc.,* 409 F.3d 1030, 1037 (8th Cir. 2005).  To establish a

*prima facie* case of retaliation, Taylor must show that 1) he participated in a protected activity; 2)

---

[13] To establish a *prima facie* case of disparate treatment discrimination, an employee must show that 1) he is a member of a protected class; 2) he was meeting his employer's legitimate job expectations; 3) he was subjected to an adverse employment action; and 4) similarly situated employees outside the protected class were treated differently.  *Philip v. Ford Motor Co.,* 413 F.3d 766, 768 (8th Cir. 2005).

Georgia-Pacific took adverse employment action against him; and 3) there is a causal connection between the protected activity and the adverse employment action.  *Hunt v. Nebraska Public Power Dist.,* 282 F.3d 1021, 1028 (8th Cir. 2002).

First, Taylor alleges that Georgia-Pacific retaliated against him when it terminated his employment in May 2006.  On November 29, 2005, Taylor filed a charge of discrimination with the EEOC.  On May 22, 2006, his employment with Georgia-Pacific was terminated.  Therefore, it is clear that Taylor participated in a protected activity and suffered an adverse employment action under the Act.  Therefore, he has satisfied the first and second elements of his *prima facie* case of retaliation.

Georgia-Pacific argues that Taylor can not establish the third element of his *prima facie* case–a causal connection between the protected activity and the adverse employment action.  To prove a causal connection between engagement in a protected activity and an adverse employment action, " ' a plaintiff must prove that the employer's retaliatory motive played a part in the adverse action.' " *Gilooly v. Missouri Dept. of Health and Senior Services,* 421 F.3d 734, 739 (8th Cir. 2005)(quoting *Kipp v. Missouri Highway & Transp. Comm'n.,* 280 F.3d. 893, 897 (8th Cir. 2002)).  A plaintiff must point to " '[e]vidence that gives rise to an inference of retaliatory motive on the part of the employer.' " *Id.* at 739-40 (quoting *Kipp,* 280 F.3d at 897).

Taylor claims that after he filed his EEOC charge major disciplinary actions were taken against him which ultimately led to his termination.  However, when Taylor filed his EEOC charge on November 29, 2005, he had already gone through three of the four steps of the progressive discipline process.  He had been suspended for three days and was on probation for twelve months.  In fact, Taylor was only one step away from discharge.  This undercuts any

finding of causation between the two events.  *See Kasper v. Federated Mut. Ins. Co.,* 425 F3d. 496, 504 (8th Cir. 2005).  Plus, it was almost six months between Taylor filing his EEOC charge and his termination.  This six month time interval can not justify a causal link as a matter of law. *Heaton v. Weitz Company, Inc.* 2006 WL 3321328 *11 (N.D.Iowa November 14, 2006)(citing *McBurney v. Stew Hansen's Dodge City, Inc.,* 398 F.3d 998, 1003 (8th Cir. 2005)).  Therefore, there is  no causal connection between Taylor filing his EEOC charge and his termination in May 2006.  Thus, Taylor can not satisfy the third element of his *prima facie* case of retaliation in connection with his termination.

Also, Georgia-Pacific has presented a legitimate, nondiscriminatory reason for discharging Taylor.  He came to work late or not at all on numerous occasions in violation of the company's attendance policy.  Taylor has not offered any evidence showing that Georgia-Pacific's stated reason for his termination was merely a pretext for the alleged discriminatory conduct. Accordingly, Taylor's claim of retaliation in connection with his termination must fail as a matter of law.

Next, Taylor claims that Georgia-Pacific retaliated against him by splitting his pay rate. On November 29, 2005, Taylor filed a charge of discrimination with the EEOC.  In December 2005, Taylor's pay rate was split.  Therefore, it is clear that Taylor participated in a protected activity and suffered an adverse employment action.  Therefore, he has satisfied the first and second elements of his *prima facie* case of retaliation.  However, Georgia-Pacific argues that Taylor can not establish the third element of his *prima facie* case–a causal connection between the protected activity and the adverse employment action.

In this case, Taylor filed his EEOC charge on November 29, 2005.  Less than a month

19

later, Michael Blackburn, the Finishing/Shipping Departmet's new Superintendent, decided to split Taylor's pay–one half at the Utility rate and one half at the Forklift Operator rate.  He also split the pay of two Caucasian Veneer Strappers, Gregory Perkins and Bradley Craig, who had not filed EEOC charges or participated in any protected activities.

In order for Taylor to establish a causal connection between his protected activity and the adverse employment action, Blackburn must have known of the EEOC charge before he made the decision to split Taylor's pay.  *See Brower v. Runyon,* 178 F.3d 1002, 1006-07 (8th Cir. 1999); *Kingsberry v. Mallinckrodt, Inc.,* 2006 WL 2356069 *8 (E.D.Mo. August 15,  2006) (citations omitted).  The undisputed evidence is that Blackburn was unaware of Taylor filing an EEOC charge until after he had made the decision to split his pay.  Therefore, there can be no causal link between the two events.

There is also no evidence that Blackburn's decision was motivated by retaliation.  In fact the evidence shows that Blackburn not only split Taylor's pay but he split the pay of two Caucasian Veneer Strappers who had not filed EEOC charges.

Georgia-Pacific has also stated a legitimate, nondiscriminatory reason for splitting Taylor's pay.  He was not entitled to full Forklift Operator pay under the Labor Agreement between Georgia-Pacific and the Union. Taylor has not offered any evidence showing that Georgia-Pacific's stated reason for splitting his pay was merely a pretext for the alleged discriminatory conduct. Accordingly, Taylor's claim of  retaliation in connection with splitting his pay must fail as a matter of law.

## II.  CLAIMS PURSUANT TO THE FMLA

Taylor's FMLA claims revolve around his absence from work on May 17, 2006.  On the

20

night of May 17, 2006, Taylor called into work after his shift had begun and stated that he was not coming to work that night because he had diarrhea.  When he came back to work the next night, Taylor provided Georgia-Pacific with a doctor's note stating that he was absent from work because of "illness." Taylor was sent home and told to come in the next day to meet with Human Resources.  A termination hearing was held on May 22, 2006.  After this meeting, Taylor was notified that he had been terminated effective May 22, 2006 for violating the company's attendance policies.

Taylor claims that on May 17, 2006, he was entitled to FMLA leave and that Georgia-Pacific interfered with him taking that leave in violation of the Act.  He also claims that Georgia-Pacific terminated him in retaliation for taking his FMLA leave.

Under the  Family and Medical Leave Act, 29 U.S.C. §2601, *et seq.* ("FMLA"), an employee is entitled to twelve (12) weeks of unpaid leave during any twelve-month period if the employee has a "serious health condition that makes the employee unable to perform the functions" of his employment position.  29 U.S.C. § 2623(a)(1)(D).   The FMLA prohibits employers from interfering with, restraining or denying the exercise of an employee's FMLA rights.  29 U.S.C. § 2615(a)(1);  *Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972, 977 (8th Cir. 2005).  It also prohibits an employer for retaliating against an employee who asserts his rights under the Act.  *Darby v. Bratch,* 287 F.3d 673, 679 (8th Cir. 2002).

To prevail on an interference claim, an employee must establish that he was entitled to FMLA leave because he suffered from a "serious medical condition" and provided his employer adequate notice of his need for FMLA leave. *Thorson v. Gemini, Inc.,* 205 F.3d 370, 376-83 (8th Cir. 2000)("serious health condition"); *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir.

1997)(notice).  To establish a "serious health condition," he must prove that he suffered an

"illness, injury, impairment or physical or mental condition" that involved  "continuing treatment

by a health care provider."  29 U.S.C. § 2611(11).  The continuing treatment test for a serious

health condition is met if he 1) is incapacitated for more than three consecutive days by the

condition and 2) is treated by a health care provider on two or more occasions or on at least one

occasion that results in a regiment of continuing treatment. 29 C.F.R. § 825.114(a)(2)(i).

   In this case, Taylor claims that he was suffering from diarrhea, that he went to the doctor

one time for this condition and was told that he had ulcers.  The doctor did not prescribe any

medication but, rather, told Taylor to take over-the-counter antacid for his condition.  A federal

regulation clearly states that, unless complications arise, upset stomach or minor ulcers do not

meet the definition of a serious health condition and do not qualify for FMLA leave.  29 C.F.R. §

825.114(c).  There is no evidence that Taylor suffered any complications in connection with his

condition.  The regulations also state that taking over-the-counter medications to treat a condition

does not constitute a regimen of continuing treatment for FMLA leave.  29 C.F.R. § 825.114(b).

It is clear that Taylor was not suffering from a serious health condition that required continuing

treatment by a health care provider as provided in the Act.  Therefore, he was not entitled to

FMLA leave for his absence on May 17, 2006.   Georgia-Pacific did not violate the Act by

denying Taylor covered leave.  Accordingly, his interference claim under the FMLA must fail as

a matter of law.

   Taylor also claims that Georgia-Pacific terminated him in retaliation for taking his FMLA

leave.  To establish a *prima facie* showing of retaliation under the FMLA, Taylor must show that

1) he engaged in conduct protected under the FMLA, 2) he suffered an adverse employment

action, and 3) a causal connection between the two. *Hite v. Vermeer Mfg. Co.,* 446 F.3d 858, 865 (8th Cir. 2006). In this case, Taylor was not entitled to FMLA leave for his unexcused absence on May 17, 2006. Therefore, it was impossible for him to engage in any conduct protected under the Act. Taylor can not satisfy the first element of his *prima facie* case. Therefore, his claim of retaliation under the FMLA must fail as a matter of law.

### III. CLAIM FOR BREACH OF LABOR AGREEMENT

Taylor claims that Georgia-Pacific breached the Labor Agreement between it and the International Association of Machinist and Aerospace Workers, Local W-475 ("Union") because he was terminated without just cause. He also claims that the Union violated its duty of fair representation when it declined to file a grievance on his behalf regarding his termination. This type of case is know as a "hybrid action" under Section 301 of the Labor Management Relations Act. ("LMRA"). It is one in which the employee has a cause of action against both the employer and the union. *Arif v. AT&T Corp.,* 959 F.Supp. 1054, 1061 (E.D. Ark. 1997). In order to prevail against either the company or the Union, the employee must satisfy his burden of proving both a breach of the terms of the collective bargaining agreement by the employer *and* a breach of the union's duty of fair representation. *DelCostello v. International Broth. of Teamsters,* 462 U.S. 151, 164-165, 103 S.Ct. 2281, 2291, 76 L.Ed.2d 476 (1983). Therefore, a Section 310 claim against the employer fails upon a finding that the union did not breach its duty of fair representation of the employee.

Taylor claims that the Union violated its duty of fair representation when it elected not to file a grievance on his behalf concerning his discharge from Georgia-Pacific. In its role as a collective bargaining representative, a union has a legal duty to represent its members adequately,

23

honestly and in good faith. *Air Line Pilots Ass'n Intern. v. O'Neill,* 499 U.S. 65, 75-76, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991).  This duty of fair representation is a judicially created duty arising out of the statutory grant of exclusive representation to unions under the National Labor Relations Act. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed.2d 1048 (1953).

A union's duty of fair representation is breached only "when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).  "Mere negligence, poor judgment or ineptitude on the part of the union is insufficient to establish a breach of the duty of fair representation." *Smith v. United Parcel Service, Inc.,* 93 F.3d 1066, 1068 (8th Cir. 1996)(quoting *Stevens v. Teamsters Local 600*, 794 F.2d 376, 378 (8th Cir. 1986)).

In this case, Taylor claims that the Union, acting arbitrarily and in bad faith, violated its duty of fair representation when it refused to file a grievance of his behalf in connection with his termination.  He also claims that the Union's conduct was based upon race and due to his having filed an EEOC charge.

A union's conduct is arbitrary if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Beavers v. United Paperworkers Intern. Union, Local 1741,* 72 F.3d 97, 100 (8th Cir. 1995)(citations and internal quotations omitted).  The fact that a union has chosen not to pursue a grievance does not constitute arbitrary conduct in and of itself.  Unions have substantial discretion in deciding which grievances to pursue. *Carnes v. United Parcel Service, Inc.,* 51 F.3d 112, 116 (8th Cir. 1995)(citing *Minnis v. International Union, United Auto., Aerospace and Agr. Implement Workers of America, UAW,* 531 F.2d 850, 854 (8th Cir. 1975)).  If a union determines

24

that a grievance has no merit, it is under no duty to pursue it.  In fact, because the union's duty of

fair representation is a collective duty, owed equally to all its members,  it is the union's

affirmative duty not to pursue a grievance which it believes, in good faith, to be without merit.

*Sanders v. Youthcraft Coats and Suits, Inc.,* 700 F.2d 1226, 1229 (8th Cir. 1983)(citations

omitted).

 In this case, there is no evidence that the Union's conduct toward Taylor was arbitrary.

After Taylor was terminated, the Union conducted a thorough investigation into the matter which

included conducting interviews and reviewing Taylor's personnel file.  Thus, there is no

indication that the Union gave Taylor's grievance request only cursory attention.  *See Curtis v.*

*United Transp. Union,* 700 F.2d 457, 458 (8th Cir. 1983).  In its investigation, the Union found

that Taylor had numerous attendance violations on his record and that he had gone through all the

steps of the company's progressive discipline process, including the optional fifth step.  As a

result of its investigation, the Union determined that Taylor's termination was justified and there

was no merit in filing a grievance on his behalf.  In light of these facts, the Court can not say that

the Union's decision not to file a grievance on Taylor's behalf was outside the " 'wide range of

reasonableness' as to be irrational."  *Beavers,* 72 F.3d at 100 (citations omitted).  Therefore, the

Union's conduct was not arbitrary as a matter of law.

 However, "a union is protected  by the 'wide range of  reasonableness' shield only if it

acted in good faith."  *Schmidt v. International Broth. of Elec. Workers, Local 949,* 980 F.2d

1167, 1170 (8th Cir. 1992).  Thus, the question remains whether the Union breached its duty by

failing to represent Taylor "without hostility or discrimination" and "with complete good faith

and honesty."  *Vaca,* 386 U.S. at 177, 87 S.Ct. at 910.  To defeat summary judgment on the issue

of bad faith, a plaintiff must offer "evidence of fraud, deceitful action or dishonest conduct" by the union. *Schmidt,* 980 F.2d at 1170.

In this case, Taylor claims that the Union acted in bad faith, when it refused to pursue his grievance. However, he has not presented any evidence to support this conclusory assertion. There is no evidence of any fraud, deceitful action or dishonest conduct on the part of the Union in this matter. Thus, the Court finds that the Union's conduct was not taken in bad faith as a matter of law.

Taylor claims that the Union refused to file his termination grievance because of his race, African-American. He claims that the Union represented various Caucasian and female employees in the past. In support of this contention, Taylor mentions the treatment of Shawn Herbert (Caucasian), Houston Pamplin (Caucasian), and Tracy Bryant (female). However, there is no evidence that the Union filed such a grievance on behalf of any of these individuals. In fact, it is doubtful that any of these individuals ever requested that a termination grievance be filed on their behalf because Shawn Herbert and Tracy Bryant both quit their jobs with Georgia-Pacific and Houston Pamplin still works there. The treatment of these individuals can not be used to show discriminatory animus on the part of the Union in this matter. Thus, the Court finds that the Union's conduct was not discriminatory as a matter of law.

Finally, Taylor claims that the Union refused to file his termination grievance because he had filed an EEOC charge against Georgia-Pacific. However, Taylor presents no evidence in support of this contention. Therefore, this claim must also fail as a matter of law.

Taylor has failed to come forth with evidence establishing a genuine issue of material fact as to whether the Union acted in an arbitrary, discriminatory or bad faith manner in its

representation of Taylor.  Thus, there is no breach of its duty of fair representation as a matter of law.

As the second part of his hybrid action, Taylor claims that Georgia-Pacific violated the Labor Agreement when if terminated him in May 2006.  However, because Taylor can not prevail on his claim that the Union breached its duty of fair representation, he can not sustain his Section 301 claim against Georgia-Pacific for violation of the Labor Agreement.  *See DelCostello*, 462 U.S. at 164-65.  Therefore, this claim against Georgia-Pacific must fail as a matter of law.

## CONCLUSION

For the reasons stated herein and above, the Court finds that Separate Defendant Georgia-Pacific  LLC's Motion for Summary Judgment should be and hereby is **granted.**  A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this 31st day of March, 2008.


    /s/Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge

27